Jeffray v. Towar.

CLIFFORD K. JEFFRAY

v.

THOMAS H. TOWAR et al.

[Filed October 3d, 1902.]

1. A customer opened at the same time two accounts with a broker—one in his individual name and the other in his name as trustee. The individual account was a speculative one, and the trustee account was chiefly a loan account. The former was a continuing one, while the latter was settled twice and reopened for a third time. In a suit by a beneficiary of the trust estate against the broker for an accounting, evidence examined, and held sufficient to show that the broker had notice that the deposits in the trust account were trust property.

2. Where a person deposits money in his own name as trustee to an amount not exceeding the sum he is chargeable with as trustee, and which amount is not identified or accounted for by him, the law presumes, in the absence of any evidence, that the money deposited consisted of property originally belonging to the trust funds, or that the deposit constitutes a fund substituted for trust funds taken, and this presumption is effective not only as against the depositor, but also as against the depositary, unless he is a bona fide depositary without notice.

3. A debt due a depositary on the individual account of a depositor cannot be set off against a balance due on the depositor's account as trustee, when the depositary had actual or constructive notice of the trust.

Heard on bill, answer, replication and proofs.

*Mr. Sherrerd Depue,* and *Mr. Wilkie* (of the New York bar), for the complainant.

*Mr. Charles H. Hartshorne,* and *Mr. Weed* (of the New York bar), for the defendant Towar.

EMERY, V. C.

The complainant, Clifford K. Jeffray, for whom Timothy T. Dwight, now deceased, held funds in trust, files this bill against Dwight's administrator and Thomas H. Towar for an accounting and for the recovery from Towar of a portion of the trust funds, or the proceeds thereof, which are alleged to be retained by him.

Towar, from the year 1884 to the year 1889, inclusive, carried on the business of a stock broker in New York City, and during those years Timothy T. Dwight was one of his customers. Towar carried two accounts with Dwight on his books, one headed "T. T. Dwight," the other "T. T. Dwight, Trustee."

The main dispute in the case is whether the defendant has a right to set off the balance due to him on the individual account against the balance due from him on the trustee account. The two accounts were opened at the same time, and it was claimed by defendant, in his answer, that, at the time of opening the two accounts, there was an express statement by Dwight to him that any funds or securities in either account should be a margin or security for the other account, and that both funds were Dwight's own funds, and it was further claimed that all the subsequent transactions with Dwight were had in reliance on this statement. Upon the argument it has not been claimed that proof of any such statement or of any express agreement has been made, but it is claimed that the evidence in relation to the circumstances of opening the accounts and to the dealings between the parties, during the running of the accounts, shows satisfactorily that there was such an agreement that the accounts were held as margin for each other, and that this agreement was

valid, because Towar had no notice that the funds or the securities placed by Dwight to the credit of the trustee account were held by Dwight in trust for complainant, or were not Dwight's individual property. The complainant, on the other hand, contends (1) that there was no such agreement of set-off between Dwight and Towar, but that the trustee account was entirely separate from the individual account, and (2) that the funds in the trustee account were derived from funds held by Dwight in trust for complainant; that Towar had notice that the funds were trust funds, and that any agreement for set-off, even if made, was illegal and invalid as against complainant. The circumstances under which the accounts were opened and the *status* of the accounts will require statement in detail, and were as follows: Previous to April 1st, 1894, Dwight, who was the surviving executor and trustee under the will of Timothy Dwight, and who had trust funds in his hands, had on deposit with a broker (Mr. Larned) $7,000, which belonged to the Timothy Dwight estate, the original source of the trust fund of complainant, the same being a loan to Mr. Larned, upon which interest was charged and paid. Larned says that he understood the money on loan was held by Dwight as trustee. Larned, at the same time, carried for Dwight a regular broker's account, upon which he purchased and sold stocks, holding the stocks purchased as security for this account. On April 1st, 1884, the amount due Larned on the personal account was $16,371.48, to secure which he held stocks of the value, as Larned now swears, of about $2,000 more. There is uncertainty about the value of some of the stocks, and defendant claims that, at that time, there was a shortage in values of about $321.48. Mr. Larned being about to retire from business and desiring to close the accounts, Dwight applied to Towar to carry the accounts, and, as Towar says, he had one or more conversations with Dwight about the transaction, and the substance of the conversation was that

"Dwight said that Mr. Larned was going out of business; that he had an account there with some stocks and bonds in it; could I take the stocks over and carry them for him, to which I said I could and would be glad to do so, and did so."

He further says:

"I was requested to open two accounts, one for Timothy T. Dwight .and one for Timothy T. Dwight, Trustee, which I did, charging Mr. Dwight with some $16,000, and crediting Mr. Dwight, Trustee, with $7,000, giving Larned & Company a check for the difference."

This check, dated April 1st, 1884, was given by Towar to the order of Larned for $9,333.98, and upon the receipt of this check the securities carried by Larned for Dwight's account were delivered to Towar's agent, who delivered the check. Towar at once opened on his books two accounts, the "T. T. Dwight" account, in which the first entry was a charge

             100 Pullman,
"To Cash  100 Ont. & West.  } from B. P. L., Jr., $16,371.48."
             100 Canton,

In this amount was included $37.50 as commission on the purchase or taking over of the stock. On the same day another account with "T. T. Dwight, Trustee" was opened on the books, with a credit of $7,000. Towar had been at one time a partner of Larned's, and Dwight had then kept an account there, but Towar says that, prior to the time when he had the transaction with him in regard to opening an account, he had no knowledge of any account being kept with Larned. There is no evidence that Towar knew Dwight was carrying two separate accounts with Larned. So far as Towar's books directly show, the two accounts have been kept entirely separate, and have no connection with each other. Dwight's individual account was never a closed account, from the time it was first opened up to the time of his death, in July, 1899, and, at that date, the amount due to Towar on this account was over $37,000, arising on the balances due upon purchases and sales of stock by Towar for Dwight and interest. The stocks purchased were (as appears by Towar's books and the accounts rendered to Dwight) held as security for his personal account, and at the time of Dwight's death the value of these stocks was only $11,000, leaving a deficiency of about $26,000. Dwight died insolvent. The trustee

account was closed twice, and its course was as follows: After being opened on April 1st, 1884, with a credit of $7,000, it was increased, by subsequent deposits of cash and credits of interest, to $9,942.37 on April 1st, 1885. By a cash draft of $10,500, made on the trustee account on May 4th, 1885, not only was the entire balance drawn out, but the trustee account was over-drawn to the extent of $4,364.04. Previous to this overdraft, however, and on May 2d, as appears by a pencil memorandum on the account, fifty-eight shares of bank stock, then worth about $7,000, were held to the credit of the trustee account. Between May 13th and June 30th, 1895, twenty-six of these shares had been sold for $3,552.49, and the proceeds credited to the account, and on July 2d, 1885, Dwight, by a check for $790.64, signed by him as trustee and drawn upon a trustee account kept in bank, settled the overdraft and balanced the account. At the time of this settlement of the overdraft thirty-two shares of bank stock, delivered in May before the overdraft, were still held by Towar, and continued to be held by him until January 20th, 1886, when they were delivered to Dwight. From July 2d, 1885, up to this return of the bank stock, no deposits or drafts were made on the account, and the account was closed, except for this memorandum of securities held. At the time the trustee account was closed, on July 2d, 1885, the indebtedness on the individual account was $8,826.55, and the shortage in the margin on the individual account was $926.55. On October 1st, 1885, with an indebtedness of $8,961.87, the shortage was only $37, and on January 20th, 1886, the date of the delivery of the securities still credited to the trustee account, the indebtedness had increased to $17,134.96, and the stocks held for the individual account were, according to defendant's evidence, worth only about $500 more than the amount of the indebtedness on this account. From this date—January 20th, 1886—the trustee account was closed, and no securities or deposits were held for its credit until November 5th, 1886, when it was opened by a cash deposit of $1,200. The state of the individual account at the different periods during this interval, at which accounts were rendered by Towar and the margin values of the stocks held for the credit of the accounts, is important, and they were as follows:

Jeffray *v.* Towar.

| | | | | | | |
|---|---|---|---|---|---|---|
| Jan. | 20, | 1886........Debit | $17,134.96 | Margin | $527.54 |
| April | 1, | "  ........  " | 11,614.65 | " | 735.35 |
| May | 3, | "  ........  " | 20,114.65 | Shortage | 1,114.65 |
| July | 1, | "  ........  " | 20,634.28 | Margin | 1,553.22 |
| Oct. | 1, | "  ........  " | 16,087.16 | " | 5,375.34 |

showing that during the whole of this time the securities belonging to the individual account and the personal security of Dwight were the only securities for the individual indebtedness. On November 12th, 1886, the trustee account was again opened by a cash deposit to its credit of $1,200, which remained on interest to January 1st, 1887. Another deposit of $10,000 cash was credited on January 29th, 1887, and, after the purchase of about $4,000 worth of railroad bonds, which were delivered at once, the balance of the account ($7,338.95) was drawn out on February 4th, 1887, and the trustee account was entirely closed for the second time. The *status* of the individual account, as rendered during this second running of the account, with the margin of stock values, was as follows:

| | | | | | |
|---|---|---|---|---|---|
| Jan. | 1, 1887........Debit | $15,805.13 | Margin | $1,419.87 |
| Feb. | 2,  "  ........  " | 16,005.13 | " | 1,294.87 |

On February 19th the trustee account was again opened by a cash deposit of $750, the indebtedness on Dwight's individual account being at this time $18,055.13, and the margin $1,944.87, or $700 more than when the account was closed on February 4th, 1887. On April 27th, 1887, there was the further large deposit of $21,561.47. The proofs satisfactorily establish that these two deposits, together with a subsequent deposit of $98.54, made on December 1st, 1887, were of funds which Dwight held in trust for the complainant, Jeffray. These funds belonged to Jeffray, who came of age in August, 1886, under the will of his grandfather, Timothy Dwight, of whom T. T. Dwight was the surviving executor and trustee. Under an agreement with Jeffray, made shortly after he came of age, and which was reduced to writing and delivered in April or May, 1887, these funds were to be held for Jeffray and invested by Dwight, the income to be paid to Jeffray during their joint lives, and on Dwight's death the title to the principal became vested in

Jeffray v. Towar.

Jeffray. Dwight proceeded to invest the larger portion of the funds in interest-bearing securities, and between April 27th and May 2d, 1887, railroad bonds to the amount of $14,000 at par, and running in value from par to $1.12¼, were purchased, as also $3,000 in railroad bonds at $0.92. These bonds were all delivered to Dwight on May 2d, 1887, and his receipt as trustee was signed on the trustee account in the books. The cost of these bonds was $17,968.64, leaving about $4,000 still uninvested to the credit of the trustee account. On April 1st, 1887, Dwight's indebtedness on his individual account was over $22,500, with a stock margin of $1,855.71, but by July 1st, the individual debit was $22,822.40, due mainly to the depreciation in value of stocks purchased after January 1st, 1887. The trustee account then had a cash balance of $4,263.49, and the three railroad bonds purchased on May 2d were, on June 21st, 1887, noted on the trustee account as returned to Towar. From this date—July 1st, 1887—the amount of indebtedness on the individual account has steadily increased to over $30,000, and the shortage to over $20,000. The balance to the credit of the trustee account at Dwight's death, in 1899, was about $20,000, with interest from January 1st, 1898, and at that time Towar also held to the credit of the trustee account two bonds of $1,000 each, and a bond of $1,000 to the credit of the individual account. All of the bonds purchased by Towar for Dwight on the trustee account in April, 1887, and delivered to him, were subsequently, and from time to time, returned by Dwight to Towar and sold for the credit of the trustee account, the proceeds going to the general credit of the account, or for the purchase of other bonds, which were also subsequently sold and credited to the account. Over $5,000 of additional cash deposits were also made by Dwight to the credit of the trustee account, and about $3,250 of this has been satisfactorily shown to have been derived from the income of the trust fund. The only other credit to this trustee account, which does not seem to have arisen from the deposit of trust funds or from the proceeds of sale of securities purchased therefor, is a deposit of nine shares of New York and New Haven Railroad Company stock. Five of these were deposited May 21st, 1891, and sold on the same day for $1,149.38,

which was credited to the account, and at that time the credit to the trustee account was $9,336.89, and the debit of the individual account was over $27,000, and the margin of this account was short about $18,000. Four shares of the New York and New Haven Railroad Company were received on October 18th, and sold on October 19th, 1893, and the proceeds—$763—credited to the trustee account, which at that time had a balance of about $15,000, while on the individual account there was due to Towar over $30,000, and the margin was short over $17,000. These nine shares of stock have not been identified as being part of the original trust funds, or the proceeds of them, but complainant claims to be entitled to the benefit of their deposit in the trustee account, as funds or securities substituted or provided by the trustee to replace securities taken by him from the trust fund. The original trust fund, held by Dwight as trustee for Jeffray, amounted to $27,629.46, and the trustee had funds or securities belonging to the trust, other than those deposited with Towar, or the proceeds of this deposit, and amounting in value to over $6,000. Not only has the trustee or his administrator failed to account to his *cestui que trust* for the principal originally deposited with Towar, or the proceeds thereof, but he has also failed to account for over $1,000 of the trust fund or securities other than that originally deposited with Towar, or the proceeds thereof. Some of the latter securities have been disposed of by the trustee, and the deposit of the New York and New Haven Railroad Company shares to the credit of the trustee account should, under these circumstances, be taken as constituting them part of the trust funds, either as the actual proceeds of the original trust property, or as funds replaced or substituted by the trustee. It is claimed by defendant that $5,201.06 credited as cash deposits in the trustee account have not been shown to have been trust funds, but the account and books of the trustee, which are evidence against defendant upon this question of identification, show that all of these cash deposits which were made previous to July, 1900, amounting to about $3,250, were derived from the income of the trust funds. The accounts in the trustee's books are broken off at this date, and there is no satisfactory evidence as to the actual source of

the subsequent cash deposits, amounting to about $2,000. But the trustee having admittedly in his hands at least this amount of the trust estate, which has never since been otherwise accounted for or identified, and having deposited the amount in the account which did contain the trust funds, it must, in the absence of proof that they did not arise from other sources, be presumed that they were either original trust funds, or funds substituted by the trustee for trust funds taken. And this presumption, thus arising, as to the character and origin of these unidentified funds or securities deposited in the account, is effective, not only against the trustee depositing them in the trustee account, but against Towar, who claims under the trustee account, unless he is a *bona fide* purchaser without notice.

From all the evidence in the case relating to the circumstances of the opening of the two accounts in April, 1884, and of the dealings of the parties in relation to them up to the time when the trustee account was opened for the third time, on February 18th, 1897, and complainant's money deposited therein, I conclude that no agreement, either express or implied, for the set-off of the two accounts, or that the cash balance in the trustee account should be held as a margin or security for the individual account, has been made out as existing at that time. On the contrary, the accounts during that interval were treated as entirely independent accounts, and the trustee account was closed out and reopened without any apparent connection with the margin or the individual account. The strongest evidence, from the accounts themselves, that the trustee account was not to keep good the individual account is that, on January 20th, 1886, when the indebtedness on the individual account was $17,134.96, and the margin was only $527.54, the securities belonging to the trustee account, then worth $3,782, and which had been held since July, 1885, were delivered to the trustee, and that no deposits, of either cash or securities, to the trust account were made until November 12th, 1886, although in the meantime and on May 3d, 1886, there was a shortage on margin of $1,114.65. The second opening and closing of the trustee account and its last reopening do not seem, on the face of them, to have any connection with the state of the margin on the individual ac-

count, or to afford any evidence of an implied agreement for set-off. On the contrary, the dealings of the parties in reference to the two accounts, up to the last time of opening the trustee account, would seem to justify the conclusion that, up to this date, they were distinct and independent accounts, not connected with or handled together. Up to this time, also, the individual account had been a purely speculative, and not an investment, account, while the trustee account, on the contrary, had been, in the main, a cash account, or loan of money from "Dwight, trustee," to the broker, and not a deposit of funds for investment. The principal deposits made to the credit of the trustee account up to and including February 18th, 1887, were by checks of "T. T. Dwight, trustee," on the Corn Exchange Bank, in which Dwight had a trustee account. These checks were $1,200, November 5th, 1886, and $10,000, January 29th, 1887, and $750, February 18th, 1887. From the time of the opening of the two accounts statements of the two accounts and memoranda of purchases and sales were submitted by Towar at frequent intervals, and these were separate and distinct statements of the accounts rendered to "T. T. Dwight, trustee," as they appeared on the books, and the receipts for cash and securities paid into the trust account were given to "T. T. Dwight, trustee," during the continuance of the account. The *status* of the parties and of the accounts at the time of the last opening of the trustee account, in February, 1887, and the question of Towar's knowledge, at that time, that the trustee account was of funds not held by Dwight for himself personally, but in trust for others, is of importance in the case, for I think the *status* of the accounts and the dealings of Dwight and Towar, after the shortage of margin on the individual account began, in June or July, 1887, by reason of the depreciation of stocks purchased early in 1887, does show that they both, while still keeping the accounts, as to form, in the same separate condition as before, did so carry them on that there was an obvious connection or relation between them, under which cash and investment securities were brought in by "T. T. Dwight, trustee," and the trustee balance increased as the losses of T. T. Dwight's individual speculative account increased. This conduct in reference to the accounts might, perhaps, be sufficient,

as between Dwight and Towar, to warrant an inference of an implied agreement to set off the balance on the trustee account against the losses on the individual account, but the real question, and the vital question in the case, is whether, before and at the time when this treatment of the accounts commenced or during its continuance, Towar had notice that the trustee account was not Dwight's individual funds, but was held by him in trust for others. If he had such notice, or was so put upon inquiry as to be chargeable with notice, then, undoubtedly, no agreement of set-off of the two accounts, whether express or implied, would be valid. When the trustee account was opened for the third and last time, and before any shortage in the individual account occurred, the further facts bearing on the question of notice were these: The account was reopened by a check of $750, signed by T. T. Dwight, trustee, to order of Towar, on February 19th, 1887, which was endorsed for deposit to Towar's account, but not by Towar himself. It has not been proved that Towar himself saw this check. On April 27th a deposit of $21,561.47, being the principal source of the funds now in dispute, was made. This deposit was from funds held in trust for Jeffray, and was derived from the payment of a mortgage held by the trustee. The manner in which the deposit was made by the trustee with Towar does not appear. This fund was not carried as a cash balance or loan with the bankers, but the entire amount (about $22,000), with the exception of about $4,000, was, as above stated, at once invested in railroad bonds, interest-bearing securities of the class generally recognized as investment, and not speculative, securities. Under the trust deed Dwight was authorized to purchase them.

These bonds so purchased were all delivered to Dwight on May 2d, 1887, and he receipted for them on the account in the books as "T. T. Dwight, trustee." On April 1st the individual debit was over $22,500, but the stock margin was over $1,800 (nearly ten per cent.), and it does not appear that there was any shortage up to the time of the delivery of the bonds. The immediate investment of the trustee account fund in securities of this character and their delivery to Dwight, on his receipt as trustee, taken in connection with the circumstances above re-

ferred to, indicating that the trustee account was, in fact, a separate and distinct account, and in no way connected with Dwight's personal account, were sufficient, I think, to put Towar on inquiry as to the funds so invested being funds held in trust. The importance of directing the present inquiry as to notice to the time when the fund was thus invested will appear from the fact that all these identical securities thus purchased for investment by Towar for Dwight, trustee, were subsequently, as the shortage of the individual account increased, brought in to the credit of the trustee account and sold, the proceeds going to the general credit of the account, or for the purchase of other bonds of like character, which were also subsequently sold and credited to the account. In this manner the entire original purchase for the "trustee" account have been again turned into cash or delivered to Towar for the credit of the same account. While these securities were thus being gradually returned by the trustee, and the balance due on the trustee account increased, the broker's attention was further directed to the character of the trustee account by the fact that bills of exchange were regularly purchased by him for Dwight for the purpose of sending abroad. These bills were sent to complainant by Dwight as the income of the fund. The first of these drafts was on August 31st, 1887, for £100, followed on July 9th, 1888, by a draft for £120, and thereafter, from February, 1889, drafts averaging about $350 were sent quarterly and reguarly up to the close of 1893, after which time they were sent semi-annually until April, 1896, when defendant declined to make any further drafts against Dwight's trustee account because of the shortage on his individual account. The entire amount of these foreign drafts was $13,261.04. Twenty-four of them (or of the duplicates) have been produced. Most of them are drawn to the order of Towar, and of these many were endorsed by him personally "Pay to the order of T. T. Dwight, trustee." There is a further fact bearing, as it seems to me, upon the question of actual notice. This was the irregular, or at least unusual, manner of securing the balances due on the personal account. It is now claimed that these balances, which were continually increasing, as the stocks held as margin fell in value, were indirectly secured by increasing

the funds and securities held for the credit of the other and the trustee account. And although these balances are large, continually increasing, and finally absorb the entire amount with which the other account commenced (about $20,000), there is no writing or document between the parties to show that the large debt on the personal account is intended to be secured by the trustee account. Written evidence, either on the accounts themselves or otherwise, that the trustee account was security for the personal account, would prove misapplication of the trust funds so far as Dwight is concerned, and his failure to provide it might be explained. But Towar's adoption of what seems to me an unusual, and certainly hazardous, method of securing the large debt due on the personal account, without anything in writing to protect him, and without any express agreement of any kind in case Dwight should deny the right to set-off, has not been satisfactorily explained. It is one of the circumstances to be considered in determining whether he did not have actual notice of the trust, and whether the indirect method of keeping the personal account secured did not indicate, on Towar's side, actual knowledge of the fiduciary character of the "trustee" account. The evidence in the case warrants the conclusion, I think, that Towar had actual notice of the fiduciary character of the trustee account. But if the facts already brought to Towar's attention, in relation to the trustee account, were not sufficient in themselves to give him actual notice of the fiduciary character of the trustee account, they were certainly sufficient to put him upon inquiry as to the character of the account, and if this duty of inquiry exists, and the failure to make the inquiry is not satisfactorily explained, Towar must be charged with constructive and conclusive notice of the facts which would have been ascertained upon due inquiry. *4 Kent Com. *179; Hoy* v. *Bramhall, 4 C. E. Gr. 74, 563 (Errors and Appeals, 1868, Depue, J.); Tanlum v. Green, 4 C. E. Gr. 105; S. C. on appeal, 6 C. E. Gr. 364 (Errors and Appeals, 1869); 2 Pom. Eq. Jur. §§ 605, 606; 21 Am. & Eng. Encycl. L. (2d ed.) 590.* No further inquiry appears to have been made by Towar, nor has the failure to inquire been explained. The contention of counsel that no duty of inquiry existed, because inquiry could only be

made of Dwight, and this would have been fruitless, cannot be sustained.   Towar's failure to perform the certain and existing duty to make inquiry cannot be excused on the uncertain and speculative assumption that Dwight would not have told the truth.   Dwight's answers to his inquiries, if falsely made, might or might not have relieved Towar from further inquiry.   This would depend altogether upon the character of his answers.   But not only can it not be conclusively presumed that Dwight's answers would have been false, but the presumption is that he would have told the truth, and up to the latter part of the spring of 1887 there does not appear to be any reason why he should not have told the truth about it.   Notice of the trust, either actual or constructive, being shown, the law is settled that the debt due on the individual account cannot be set off against the trust funds.   All authorities agree on this point, and the principle is best stated in the terse language of Vice-Chancellor Knight-Bruce, in *Pannell* v. *Hurley, 2 Coll. 241:* "Money is due from A to B, in trust for C.   B is indebted to A on his own account.   A, with knowledge of the trust, concurs with B in setting one debt against the other, which is done without C's consent.   Can it be a question in equity whether such a transaction can stand?"   The decisions differ as to what facts are sufficient to put a banker or broker upon inquiry, and there is especially a variance in the authorities as to the effect to be given to the mere designation of the accounts.   Vice-Chancellor Knight-Bruce, in *Pannell* v. *Hurley, supra,* says, in the course of his opinion: "If the only notice to the bankers had been the title to the account [Pannell estate, Davey, trustee], this might have been a case of more difficulty."   A later case (*Ex parte Kingston, L. R. 6 Ch. App. 632*) seems, however, to give greater effect to the mere designation of the account where there are two concurrent accounts, one personal, the other designated as trustee.   In the decisions of New York it has been declared that the fact that an account with a bank was opened by one P. as "trustee," or that he added the word "trustee" to his signature upon the note, did not put the bank upon inquiry as to the title to bonds, negotiable by delivery, which were pledged to secure the payment.   In this case, it will be observed, there were

not two concurrent accounts. Some courts have declared that where a depositor has two concurrent accounts with a bank, one individual and the other "trustee," the mere designation of the account as trustee will, unless special circumstances be shown, import the existence of a trust and be notice of the character of the fund. In cases of this character the mere existence of two concurrent accounts, one of which is purely individual, is a fact to be considered, for the reason that the designation, which is adopted by the depositor himself, to distinguish it from his individual account, must mean something, and, in the absence of other notice, must be considered his declaration that the fund is a trust fund, as distinguished from his own fund. In *National Bank* v. *Insurance Co., 104 U. S. 54*, where a depositor had two accounts, one "A. H. Dillon, Jr.," and the other "A. H. Dillon, Jr., general agent," and in the latter account deposited money collected for an insurance company, of which he was the agent, and the depositor gave a check on his agent account to satisfy his indebtedness to the bank on his personal account, it was held that inasmuch as the bank was seeking to assert its lien as banker for a personal obligation of the depositor known to have been contracted for his private benefit, the designation of the account could not be held to be a mere description *personae*, but it was notice that the fund represented by the account was not the individual property of the depositor if it is shown to consist, in whole or in part, of funds held by him in a trust relation. The special circumstances at the opening of two accounts may, however, be such as to give the right to set off the two accounts. Thus, in *Boody* v. *Pratt, 35 Vr. 281 (1900)*, a depositor having funds of his own, in his own account, with a broker, transferred a portion of the balance due him to an account in the name of his wife, proposing to continue transactions with the broker on both accounts. At the time of the transfer the depositor stipulated that, notwithstanding the transfer, the new account should, to the extent of the amount transferred from depositor's own account, make good that account. It was held that this agreement authorized the transfer or set-off. These cases, which are only a few of those cited in the very able and elaborate briefs of counsel, illustrate the principles applicable to

Jeffray v. Towar.

the decision of the present case. The case, it will be observed, is not one where a banker or broker, having two accounts with his customer or depositor, one of which is designated as "trustee" account, or having only one account as "trustee," is called on by his customer or depositor to honor his (the customer's or depositor's) checks or orders in favor of a third person, not the banker or broker. The law as applicable to this class of cases is that the banker or broker is not justified in refusing to honor the customer's check or demand upon the trustee account, unless an intent to misapply the trust exists on the part of the trustee, and the bankers are privy to this intent to make the misapplication. *Gray* v. *Johnston, H. L. 3 Eng. & Ir. App. 1 (1868)*, is a leading case discussing the subject. But where the customer or depositor draws upon the account, which, on the face of it, is called a "trustee" account, for the benefit of the banker or broker, and for the credit of another account carried by the broker as a personal account, the banker or broker receives a direct personal benefit from this transfer of the credit from the trustee account, and in such cases the only question to be decided is whether the banker or broker had notice that the "trustee" account was held in trust by his depositor for the account and benefit of others. If he had such notice, then, as against the *cestui que trust,* a payment of the individual account, by a check on the trustee account, would not be valid, and, *a fortiori,* the right of set-off, either with or without the consent of the depositor, could not exist as to any indebtedness on the personal account arising after notice.

I conclude, as the result of all the evidence in the case, that the defendant Towar did have notice of the character of the fund in the trustee account, and that it was held by Dwight as trustee and in a fiduciary capacity. Knowledge or notice of the identity of the persons for whom the trustee held the trust fund, at the time the individual debt was accruing, was not necessary in order to prevent the defendant from holding the trust fund for his personal benefit.

So far therefore as the funds in the trust account have been identified or traced as trust funds, no right of set-off exists.

And as to the cash deposits or fund whose sources have not been clearly traced and which were deposited to the credit of the trustee account, and which have not been proved to be individual moneys, the same rule must be applied. At the time of their deposit the defendant, as I have found, had notice of the character of the fund in the trustee account as a trust fund, and, where such notice exists, the rule is that even where deposits in the trustee account are proved to have been made with the depositor's personal funds, but the deposits were made to replace or restore trust funds for which he was accountable, the deposits become trust funds, by way of substitution, and the beneficiaries are entitled to hold them. *Baker* v. *New York Bank, 100 N. Y. 31, 34.* In *Ex parte Kingston, 6 Ch. App. 632 (1871),* the bankers themselves, from the depositor's personal account, made payments to the credit of his trust account, and it was held that even these payments became trust funds if the money was due to the trust, and a set-off of the two accounts, even to this extent, was not allowed. The defendant still holds two first mortgage bonds of the Colorado Coal and Iron Company, of $1,000 each, both deposited or held to the credit of the trust account. The transaction relating to these bonds, as appears from Towar's statement to Dwight, trustee, and his books, is as follows: On May 3d, 1889, Towar bought for account of Dwight, trustee, $3,000 Colorado Coal and Iron Company bonds for $2,913.75, and received from Dwight $3,000 in E. T. consols. These latter bonds were sold on May 7th, 1889, for $3,150, and the trustee account was put in funds, not only for the Colorado Coal and Iron Company bond purchase, but also for sending the draft of $391.60 to Jeffray on May 13th, 1889. The three Colorado Coal and Iron Company bonds were delivered to Dwight on May 3d, 1889, and were afterwards received by Towar from Dwight for credit to the trustee account, two of them on August 18th, 1890, and one on October 14th, 1890. One of these bonds was sold on October 21st, 1895, for $1,000, which was credited to the account, and the other two bonds are in defendant's hands. Complainant is entitled to these bonds, as proceeds of the trust fund, and defendant must account for the interest received, so far as not already received and charged in his account. There

remains to be considered the *status* of one bond of $1,000 of the Wisconsin Central Railroad Company in Towar's hands. Its *status* as part of the trust fund is as follows: Two bonds of $1,000 each of the Chippewa Falls Railway Company were part of the original trust estate in Dwight's hands and part of the trust funds described in the deed of trust. On October 22d, 1895, one of these bonds was delivered by Dwight to Towar and was credited by Towar to Dwight's individual account. The bond was a coupon bond, payable to bearer, and there does not appear to have been anything on the bond itself to indicate that it was held by Dwight as trustee. The bond was delivered to Towar on October 22d, 1895. At that time the individual indebtedness was $32,998.72, with securities to its credit valued at $10,697.50. The margin on this account was short $22,301.22, and the balance to the credit of the trustee account was $20,339.79. Towar's account of the transaction is

"I recall the occasion when the Chippewa Falls bond was brought in; I had asked him for more margin and he brought it in as additional margin, and nothing was said as to what account it was to be put in."

Upon the day the bond was brought in, however (October 22d, 1895), a foreign draft was purchased by Towar for $782.40, payable to his order, and was endorsed by Towar personally. *Exhibit C 15.* Above the signature is the endorsement "Pay T. T. Dwight, Trustee, or order," in Dwight's handwriting. Whether this endorsement was made before or after Towar's signature does not appear, but the trustee account was on that day charged with $782.40 and the bond itself credited to the personal account. This foreign draft was sent by Dwight to Jeffray, and I think the only conclusion to be drawn is that, on that day, the bond was brought in for the purpose of securing Towar for purchasing this draft. Towar had not advanced any cash or paid any drafts on Dwight's personal account since May 6th, 1890, nor had Dwight, since that date, made any payments or deposits to the credit of that account; and since September 18th, 1891, no purchase of stock on this account had been made. The fact that the bond was delivered in order to secure the

purchase of the draft, in connection with the fact that the draft, when purchased, was charged to the trustee account, would seem to indicate the intention of both parties to have the security itself credited to the trustee fund. It is clear, I think, under the circumstances, that in equity and in the absence of any special agreement, the trustee account was entitled to be credited with the bond, to the extent at least of the charge made against it on its receipt. Such credit to the trustee account would fully protect Towar for advances made on the credit of the bond, and as the bond was, in fact, trust property, and Towar made no additional advances on the personal account, either then or afterwards, on the strength of the bond, the burden is on Towar to show a special agreement for the division of the security of the bond and for its further deposit to the credit of the personal account. Towar has failed to prove any such agreement for division and deposit, and the bond must be held to have been originally delivered for the credit of the trustee account, and Towar, being allowed credit on the trustee account for the amount advanced on the delivery of the bond, must surrender the Wisconsin Central bond, into which this Chippewa Falls bond was subsequently converted, and must account for interest since its receipt. Dwight has left among his papers an unsigned receipt, with his statement endorsed (*Exhibit C 24*), that the special agreement between him and Towar, in reference to this bond, was that, after deducting $782.40 and interest from the proceeds of the bond, when sold, the balance should be paid to "Dwight as trustee for Clifford K. Jeffray." As the receipt and statement, however, seem to have been written by Dwight in the absence of Towar and after the delivery of the bond, I have not considered them as evidence against Towar upon the question of the application of the bond to the accounts.

The only remaining question is that of interest. The balance now appearing to be due on the trustee account results, to some extent, from the compounding of interest on the balances, with quarterly or semi-annual rests, up to January, 1897, from which time the rests are annual. As between Dwight himself and Towar, such compounding might not be unauthorized, because it was evidently due to the fact that interest on the per-

sonal account was compounded quarterly. As the complainant's claim is based wholly on the right to follow trust funds, my present view is that the account should be made up with annual rests. As this question, however, has not been fully argued, I will hear counsel upon it, if they desire, at the time of settling the decree for account.