## WALTERS NAT. BANK v. BANTOCK.

No. 3320.　Opinion Filed December 20, 1913.

(137 Pac. 717.)

1.　**BANKS AND BANKING—Deposit—Right to Appropriate—Trust Fund.** A bank generally has the right to appropriate the funds of a depositor to the extent of the indebtedness due from him; but if the deposit, or any part thereof, is a trust fund, and the bank has notice of this fact, it will be liable to the true owner if it appropriates such fund to the discharge of an indebtedness due from the depositor.

2.　**ASSIGNMENTS—Check—Effect to Assign Deposit.** Ordinarily the drawing of a check in the usual form by a depositor against his account in a bank does not operate as an equitable assignment, pro tanto, of the fund before such check has been accepted or certified.

3.　**SAME—Check on Particular Fund—Escrows.** Where the depositor of a trust fund in a bank enters into a contract with another person that such fund shall be deposited and held in escrow to insure the completion of a sale of land, and such parties go to the bank and fully disclose their intentions so to use the fund, and the bank advises both parties that a check for the amount of the fund will be paid, and to satisfy them thereof takes a check already executed for the full amount of the deposit, and writes into the face of the check "in escroe," and the check, in lieu of the money, is then placed with the contract in the hands of the bank's cashier to be held in escrow, pending the completion of the sale of the land, and which sale is later completed and

the check is delivered over according to the escrow agreement, held, that the transaction operated as an equitable assignment of the fund; that there was privity between the bank and the payee of the check, who, upon the bank's refusal to pay the same, had a right to sue and recover the amount of the fund.

4. **TRIAL—General Finding—Construction.** A general finding by a jury in favor of a party includes a finding in his favor on all the material issues in the case.

5. **APPEAL AND ERROR—Verdict—Conflicting Evidence.** Where the evidence in a case is conflicting, the verdict of a jury thereon will not be disturbed, where the evidence and the inferences legitimately to be drawn therefrom support the verdict.

6. **CONTRACTS — Right to Enforce — Illegal Contract.** A lawful agreement between parties will be enforced, even though it may be incidentally or indirectly connected with a contract that is illegal, where such lawful agreement is supported by an independent consideration, and can be proven without the aid of the illegal contract.

(Syllabus by Brewer, C.)

*Error from District Court, Comanche County;*
*J. T. Johnson, Judge.*

Action by H. Bantock against the Walters National Bank, a corporation. Judgment for plaintiff, and defendant brings error. Affirmed.

*R. J. Ray* and *Chas. Mitschrich,* for plaintiff in error.

*H. F. Tripp, I. K. Revelle,* and *Gray & McVay,* for defendant in error.

Opinion by BREWER, C. The defendant in error, Bantock, as plaintiff below, sued the Walters National Bank for the sum of $1,000, and upon a trial before a jury was given a verdict for the sum claimed. The defendant bank has appealed on case-made to this court.

Bantock employed the W. E. Wilson Realty Company, a copartnership, composed of W. E. Wilson and W. W. Graves, to sell a farm belonging to his mother-in-law. The realty company found a purchaser who lived in Nebraska, who agreed to take the farm for $5,450, and sent to the realty company a draft for the sum of $1,000 to be applied to the purchase. This draft arrived in Walters, Okla., October 28, 1907, simultaneously with

what has been called the bankers' panic of that year. The farm proposed to be sold was a homestead entry, in the name of plaintiff's mother-in-law, and the final proof had not been completed; at least, title could not at the time be conveyed. As to the handling of the sale and the use of this $1,000 draft out of which this suit arose, the evidence is conflicting. Plaintiff's evidence shows: That, when this draft was received, Mr. Sultan, the cashier of defendant bank, was shown the same and was told about the land sale and the purpose of the draft, and insisted that, as the bank needed exchange badly, the draft be deposited in the bank, and it could be used in the land trade through a check against it. That it was so deposited on October 28, 1907. That next day, plaintiff and the members of the realty firm went into the bank and showed the cashier a contract that had been entered into providing for the sale of the farm, one of the provisions of which was that each party, Bantock upon the one hand, and the realty firm on the other, should deposit $1,000 to insure faithful performance of the contract of sale. To accomplish this the realty company executed its check for $1,000 and Bantock executed his for a like amount, and these checks and the contract of sale were read and understood by the cashier of the bank. That one of the realty men and also Bantock asked the cashier if that check would be good for the money upon plaintiff's completing the sale, and that the cashier assured them it would, and stated he would fix it so it would be good, and, taking the check which had been already prepared, inserted in its face the words "in escroe." That the cashier then took the papers, put them in an envelope, and held them for the parties. About April, 1908, Bantock had the farm conveyed, in everything fulfilling the contract so to do, and the contract and checks were delivered to him by the bank. The check for the $1,000 was presented, and the bank refused to pay it on the ground of "no funds." The bank explained the disappearance of the fund by saying that the $1,000 deposited by the W. E. Wilson Realty Company had been appropriated by the bank towards the liquidation of the individual notes of the partners in the realty firm.

The circumstances of the deposit of the $1,000 are best told by W. E. Wilson of the realty firm, who, after stating that he received the draft from the purchaser of the farm in Nebraska, made payable to W. E. Wilson Realty Company, and told the cashier of the matter, says:

"A.   Well, I told Mr. Sultan I had a draft there.   I had been out to see Mr. Bantock, and he was to come in next day, and I told Mr. Sultan.   *   *   *   A. I told Mr. Sultan I had a $1,000 draft for Bantock, and Mr. Sultan asked me to deposit the draft.   I says, 'I don't feel like depositing the draft until he comes in and fixes the deal up,' but he says: 'You go ahead and deposit that draft, I want this draft in exchange.'   *   *   *   A. Well, I went and talked to Mr. Graves (his partner), and we deposited the draft in our name, but we had it understood with Mr. Sultan it was Mr. Bantock's money, and he told us we could check on this thousand dollars and close the deal next day," etc.

This deposit was the only one ever made by the realty company.   The cashier of the bank in a way denies this evidence. The next day after making the deposit, the plaintiff, Bantock, also both Wilson and Graves, of the realty firm, testify that they went into the bank and met the cashier, Sultan, and explained the nature of the contract for the sale of the farm; showed him the contract, which he read; and Mr. Wilson states what was done as follows:

"A.   When I and Mr. Bantock and Mr. Graves went to see Mr. Sultan about this deal, I says to Mr. Sultan, I says, 'Was our check good for a thousand dollars to Mr. Bantock?' and Mr. Sultan says, 'Most assuredly it is,' and Mr. Bantock asked him then if it is good, and he says, 'Give me the check and I will make it good,' and he takes it and wrote that word in there taking it to the desk, and took his pen and wrote that on the check, and Mr. Bantock accepted the check."

The words referred to as having been written in the check by the cashier are "in escroe."   That this was written by the cashier to satisfy Bantock that the check would get the money upon the completing of the contract is positively stated by the three witnesses mentioned.   Mr. Sultan denied writing the words in the check; in fact, he set up an alibi and disclaimed any knowledge, at the time, of the escrow agreement.   For the purpose of

comparison of handwriting, the cashier introduced a number of papers he had written in which the word escrow appears. The court and jury evidently had the benefit of a comparison of these writings with the one in dispute; but we have not the same opportunity, as nothing but typewritten copies are before us. Six of these exhibits have the word escrow on them spelled "escroe," as it was on the check in suit.

We do not understand this to be the usual way of spelling the word, and this circumstance that the cashier had spelled the word in this peculiar manner in the exhibits may have had weight with the jury. At all events, we take it the jury found against defendant on this point, as well as on the point that the cashier understood the nature and purposes of the draft deposited, whom it came from, and how it was to be used, and that it was not the property of the real estate firm, for the reason that a general finding in favor of a party by a jury includes a finding in his favor on all the material issues in the case.

The assignments of error go to: (1) The refusal of the court to direct a verdict for defendant. (2) The admission of incompetent evidence. (3) The refusal to give certain instructions. (4) The giving of certain instructions. The greater part of the brief is devoted to the first of these assignments.

Notwithstanding the vast amount of industry and ingenuity employed by appellant to convince this court otherwise, from a study of the facts of this case, it does not seem to us that many words are required to show that the bank can assert no justification in law or equity for withholding this deposit and appropriating it as has been done. Assuming that plaintiff's evidence is true, as evidently believed by the jury, the bank in receiving this deposit full well knew that it was not the property of the realty company; that in fact it was the property of the Nebraskan placed in trust with the realty company, to become the property of plaintiff, upon the completion of the sale of the land. Its trust character was well known, as well as the exact and specific use intended by the parties to be made of the fund. Yet the bank with this knowledge appropriated the fund, which it knew did not belong to the realty firm or either of the partners therein, to the payment of the notes owing by those individual partners. It had

no right to do so, and acquired no title to the funds by reason of its attempted appropriation. The principle announced in the cases of *Shawnee Nat. Bank v. Wooten & Potts,* 24 Okla. 425, 103 Pac. 714, and *F. & D. Co. v. Rankin,* 33 Okla. 7, 124 Pac. 71, fully sustain the views above expressed. In the Rankin case, *supra,* the depositor of the trust fund joined the bank in an effort to appropriate the same to the payment of his individual indebtedness to it by executing his check in his trust capacity. But the court held that the bank could not thus acquire title to the money thus obtained, where it had knowledge of the trust character of the funds and that they were being improperly applied. In the Rankin case, *supra,* the authorities are collected, and it is not necessary to set them out again. There is nothing in *Forbes v. First Nat. Bank of Enid,* 21 Okla. 206, 95 Pac. 785, in conflict with the views expressed herein. But if it may be doubted that those expressions of our own court are fully applicable, and decisive of this case, we refer to the following authorities: *Judy v. Farmers' & Traders' Bank,* 81 Mo. 404; *Deal et al. v. Mississippi Co. Bank,* 79 Mo. App. 263; *Paul v. Draper,* 73 Mo. App. 566; *Bessemer Sav. Bank v. Anderson,* 134 Ala. 343, 32 South. 716, 92 Am. St. Rep. 38; *Amer. Ex. Nat. Bank v. Mining Co.,* 165 Ill. 103, 46 N. E. 202, 56 Am. St. Rep. 233; *American Trust & B. Co. v. Boone's Adm'r,* 102 Ga. 202, 29 S. E. 182, 40 L. R. A. 250, 66 Am. St. Rep. 167; *Duckett v. Bank,* 86 Md. 400, 38 Atl. 983, 39 L. R. A. 84, 63 Am. St. Rep. 513; *Union Stockyards Bank v. Gillespie,* 137 U. S. 411, 11 Sup. Ct. 118, 34 L. Ed. 724; *Parker v. Hartley,* 91 Pac. 465; *Jeffray v. Towar et al.,* 63 N. J. Eq. 530, 53 Atl. 182; *Van Alen v. American Nat. Bank,* 52 N. Y. 1; *Jamison v. Howard Lockwood & Co.,* 26 Misc. Rep. 730, 56 N. Y. Supp. 1085; *Union Stockyards Bank v. Moore,* 79 Fed. 705, 25 C. C. A. 150; *Globe Savings Bank v. National Bank of Commerce,* 64 Neb. 413, 89 N. W. 1030; *Cady v. South Omaha Nat. Bank,* 46 Neb. 756, 65 N. W. 906.

It having been determined that the bank's attempt to appropriate the deposit utterly failed, it still remains to be seen whether, under the circumstances, plaintiff has a cause of action for the amount of the deposit against the bank.

Ordinarily the drawing of a check in the usual form by a depositor against his account in a bank does not operate as an equitable assignment, *pro tanto,* of the fund, before such check has been accepted or certified. *Guthrie Nat. Bank v. Gill,* 6 Okla. 560, 54 Pac. 434; *First Nat. Bank v. School Dist.,* 31 Okla. 139, 120 Pac. 614, 39 L. R. A. (N. S.) 655; section 4239, Rev. Laws 1910. And it seems the weight of authority is that the holder of such check cannot, ordinarily, maintain a suit thereon against the bank, for want of privity of contract (*Bank v. Millard,* 77 U. S. [10 Wall.] 152, 19 L. Ed. 897; *First Nat. Bank v. Whitman,* 94 U. S. 343, 24 L. Ed. 229; *Aetna Nat. Bank v. Fourth Nat. Bank,* 46 N. Y. 82, 7 Am. Rep. 314); but whether our statute would change this general rule against the maintenance of such a suit need not be inquired into nor decided here, for reasons that will appear as we proceed.

A very clear discussion of the rule adverted to, admitting the exceptions which it is believed removes this case from its application, assuming the rule to prevail here, is found in two of the cases last cited (*Bank v. Millard, supra,* and *First Nat. Bank v. Whitman, supra*). In the Millard case, after discussing the rule and collecting the authorities, the court say:

"On principle, there can be no foundation for an action on the part of the holder, unless there is a privity of contract between him and the bank. How can there be such a privity when the bank owes him no duty and is under no obligation to the holder? The holder takes the check on the credit of the drawer, in the belief that he has funds to meet it, but in no sense can the bank be said to be connected with the transaction. If it were true that there was a privity of contract between the banker and holder when the check was given, the bank would be obliged to pay the check, although the drawer, before it was presented, had countermanded it, and although other checks, drawn after it was issued, but before payment of it was demanded, had exhausted the funds of the depositor."

In *First National Bank v. Whitman, supra,* Justice Hunt, for the Supreme Court of the United States, after holding:

"The payee of a check which has not been accepted by the bank on which it is drawn cannot maintain an action upon it against the bank. Until acceptance there is no privity of contract between the payee and the bank"

—proceeds to explain that privity of contract between the check-holder and the bank may take the case out of the general rule, and authorize a suit by such holder against the bank, and he says:

"It is not to be doubted, however, that it is within the power of the bank to render itself liable to the holder and payee of the check. This it may do by a formal acceptance written upon the check, in which case it stands to the holder in the position of a drawer and acceptor of a bill of exchange. *Merch. Bk. v. State Bk.*, 10 Wall [77 U. S.] 604, 19 L. Ed. 1008; *Espy v. Bk.*, 18 Wall. [85 U. S.] 604, 21 L. Ed. 947. It may accomplish the same result by writing upon it the word 'good,' or any similar words which indicate a statement by it that the drawer has funds in a bank applicable to the payment of the check, and that it will so apply them. *Cooke v. Bk.*, 52 N. Y. [11 Am. Rep. 667]. And such certificate, it is said, discharges the drawer. As to him it amounts to a payment. *Bk. v. Leach*, 52 N. Y. 350 [11 Am. Rep. 708]; *Meads v. Bk.*, 25 N. Y. 143 [82 Am. Dec. 331]; *Mussey v. Bk.*, 9 Metc. [Mass.] 311; *Willets v. Bk.*, 2 Duer [N. Y.] 121. Whether this certificate be obtained by the drawer before the check is delivered, and is thus made an inducement to the payee to receive the same, or whether it is made upon the application of the payee for his security, is of no importance. It is a contract recognized by the law, valid in its character, which essentially changes the position of the parties. The privity of contract with the drawee, which before pertained to the drawer alone, is now imparted to the payee, and the duty which before existed only to the drawer now exists to the payee."

See, also, for full discussion of what circumstances will constitute an equitable assignment of a fund, *Fourth Street Nat. Bank v. Yardley, Receiver*, 165 U. S. 634, 17 Sup. Ct. 439, 41 L. Ed. 855, and copious note.

When we view what transpired in the bank when the check was drawn on this fund, where all the parties in interest were assembled for the express purpose of providing this fund should be used, in the light of the knowledge possessed by the cashier, we think a privity of relation and contract sufficient to authorize the maintenance of this suit by plaintiff is fully established. The fund consisted of the one item; the ownership and purposes for which it was intended being known to the bank when deposited.

When the parties met the day following the deposit, the contract relative to the sale of the land had been written. It provided that each of the contracting parties deposit $1,000 in money, with the contract, to secure its faithful performance. Instead of taking the cash out of the bank and putting it physically in escrow, it was decided to represent it by the check; this was to the decided advantage of the bank, in those panicky times, regardless of who proposed the plan. The realty firm and the plaintiff both inquired of the banker if this check would get the money, meaning of course the identical fund in question; the banker assured both parties it would get the money; then, to reassure them, he took the check already executed, and said he would "fix it." He then wrote in the face of the check "in escroe," which could have been for no other purpose than to convince the parties that the fund represented by that check would be set apart and held for the payment of that check upon the completion of the contract.

Some considerable time is used in an argument that it was illegal to contract for the sale of this land before final proof had been completed, and for that reason the suit against the bank for this deposit must fail. We do not think so. This is not an action on an illegal contract, but is to recover a deposit held by the bank in trust, and which it wrongfully appropriated to its own use and refused to turn over as it had under the course of dealings become bound to do. A lawful agreement between parties will be enforced, even though it may be remotely, incidentally, or indirectly connected with a contract that is illegal and therefore unenforceable, where such lawful agreement is supported by an independent consideration, and which can be proven without the aid of the illegal contract. *City Nat. Bank v. Mitchell et al.,* 24 Okla. 488, 103 Pac. 720, 20 Ann. Cas. 371.

It is also asserted that the contract between the plaintiff and the realty company as agent, put in escrow, was illegal because it provided a forfeiture. We think the real purpose of the contract was to secure a faithful and prompt completion of the sale, and that the $1,000 deposited by the purchaser was certainly intended to be turned over as a payment of the consideration of

the sale. This is what the parties attempted, and the bank has thus far frustrated. We fail to see wherein it is the business of the bank to censor the contracts of its clients, in which it has no concern, and apply to such contracts a construction that would render them invalid, when the parties themselves have acted upon them, thus construing them, in a way that shows the intention not to be illegal.

2. The point that incompetent evidence was admitted is not well taken. The witness was asked how he came to make the deposit of this particular draft. An objection was made and overruled. We think the circumstances and disclosures made to the bank when making this deposit were competent and material. And while the witness in proceeding in narrative form may have stated some things not strictly competent, no further objections were made, and we do not feel called upon to consider the evidence in detail.

3. The instructions to the jury, taken as a whole, are substantially correct. The theory of defendant was presented, if we mistake not, in the language of its own counsel. And in the light of our holding herein as to the law of the case the instructions were as liberal to defendant as it could have possibly expected. No good service would be rendered in prolonging this opinion with a recital of the instructions given and those refused. together with an analysis thereof.

The cause should therefore be affirmed.

By the Court: It is so ordered.