## FIRST NATIONAL BANK IN OKLAHOMA CITY v. DUNCAN.

No. 17638. Opinion Filed Oct. 25, 1927.

(Syllabus.)

1. Banks and Banking—Trust Fund Deposited with Bank not Subject to be Set Off Against Depositor's Individual Debt to Bank—Circumstances Putting Bank on Inquiry as to Trust Character of Deposit.

Where a bank, although having no actual notice of the trust character of funds deposited with it has knowledge of circumstances such as are regarded as sufficient to necessitate inquiry upon its part, such bank cannot, as against the true owner, set off such funds against the individual indebtedness of the depositor to the bank.

**2. Same—Rule as to Bank Appropriating Trust Fund on Deposit not Affected by Packers and Stockyards Act.**

The rule above announced. in paragraph 1 of the syllabus, under the facts in the instant case, is not changed by reason of the Act of Congress of August 15, 1921, commonly known as the Packers and Stockyards Act, and the rules and regulations promulgated by the Secretary of the Department of Agriculture in pursuance thereof.

**3. Same—Action Against Bank by Owner of Trust Fund Deposited — Evidence of Drafts.**

Under the circumstances in this case, as set forth in the opinion, held, it was not error to admit in evidence a series of drafts drawn by plaintiff on the National Live Stock Commission Company and paid through defendant bank.

**4. Same—Evidence Justifying Submission to Jury.**

Evidence examined; held, sufficient to sustain the trial court in submitting the case to the jury.

Commissioners' Opinion, Division No. 2.

Error from District Court, Oklahoma County; William H. Zwick, Judge.

Action by G. C. Duncan against the First National Bank in Oklahoma City. Judgment for plaintiff, and defendant appeals. Affirmed.

Wilson & Wilson, for plaintiff in error.

Suits & Hall and Foose & Brown, for defendant in error.

HERR, C. The plaintiff in error will be referred to as defendant and the defendant in error as plaintiff, as the parties appeared in the trial court.

The plaintiff, for cause of action against the defendant, alleges the following state of facts: That on and for a long time prior to February 2, 1925. the plaintiff had been shipping cattle and hogs and clearing his business through the National Live Stock Commission Company, and drafts covering purchase price of live stock would be drawn by plaintiff on said National Live Stock Commission Company, and cattle and hogs so purchased were shipped to said commission company; proceeds derived from the sale thereof were held in trust by said company for the benefit of the plaintiff which enabled him to continue making purchases of live stock and shipping them to market at Oklahoma City to be sold by said commission company; and that all of the facts in relation thereto were known by the defendant; that on or about the 2nd day of February,

1925, plaintiff purchased three carloads of hogs from various farmers and stockmen in and surrounding Blaine county, Okla., and in payment thereof drew sight drafts on the commission company, payable to the individual owners of said hogs, and that of the drafts drawn, a total of $1,112.20 thereof was paid by the commission company, leaving the balance unpaid of $2,887.80; that on said 2nd day of February, 1925, plaintiff shipped said three carloads of hogs to the Cassidy Southwestern Commission Company at Fort Worth, Tex., and drew a draft on said company for the sum of $4,000 which draft was made payable to the National Live Stock Commission Company and delivered to said National Live Stock Commission Company for the specific purpose of paying outstanding drafts drawn theretofore by him and delivered to the various individuals in payment of purchase price of the hogs contained in the aforesaid shipments; that the $4,000 draft, when received by the National Live Stock Commission Company. was by it deposited in the defendant bank, and that the moneys represented thereby belonged to the plaintiff except in so far as the commission company paid the drafts which he had heretofore drawn, and which drafts so paid amounted to the sum of $1,112.20, as aforesaid; that the National Live Stock Commission Company was engaged in the brokerage business at all times, acting as agent either for the seller or purchaser of live stock, and that the defendant had knowledge of all of said facts and knew the character of the commission company's business, and that it was acting as agent to the plaintiff in the sale and purchase of said hogs; that the deposit of $4,000 made by the commission company in said bank did not in any way cause it to extend any credit to the commission company, or alter its position in any manner; that by reason of the long course of dealing between the commission company and the said defendant bank, the officers of the bank had knowledge of the business relations between the plaintiff and the commission company, and knew that the $4,000 draft in question was taken and held by said company for the use and benefit of the plaintiff for the purpose of paying the outstanding drafts which he had drawn on the commission company.

The second cause of action of plaintiff declares that the commission company was, on February 2, 1925, indebted to the defendant bank on an overdraft of approximately $10,000 and when the aforesaid draft was deposited to its credit, the bank and its officers and agents and employees appropriated

the money in payment of the pre-existing debt evidenced by said overdraft; that the draft was sent to Ft. Worth, Tex., by said bank, as a protest to be paid at once or protested, and that the same reached the Ft. Worth bank, and the drawee in said draft named, before the hogs reached the stockyards at Ft Worth; that in so handling said item. the defendant bank departed from its usual and customary method of handling such drafts; that the draft had been received by said National Live Stock Commission Company from the plaintiff as a trust fund. and no part of it belonged to the commission company, but the same was entirely the proper'y of the plaintiff, and the only purposes for which it was delivered to the commission company was to furnish it funds with which to pay the drafts drawn by the plaintiff on it given to the individual owners of the hogs in question; that the defendant bank had knowledge that the draft drawn by him on the Cassidy Southwestern Commission Company, and which he had delivered to the National Live Stock Commission Company, was to be used in taking up his draft drawn for the purchase price of the hogs; that said bank received said $4,000 on deposit, and notwithstanding its knowledge aforesaid, turned down the drafts drawn by the plaintiff on the commission company and refused to apply said fund to the payment thereof; that by reason of the knowledge of said bank of the character of the commission company's business, and the character of the business conducted between the plaintiff and the said company, the bank had knowledge of the purposes for which said $4 000 draft had been received by the commission company and knew the funds raised thereon were trust funds for the purpose aforesaid, and notwithstanding such knowledge the bank had applied the same to the payment of its overdue debt evidenced by the overdraft against the commission company. The prayer of both counts is identical, that is. for money judgment against the defendant for the sum of $2,887.80, with interest from February 2, 1925.

The answer of the defendant was, first, a general denial, and a specific denial of knowledge. actual or constructive. on its part of the character of the funds deposited by the National Live Stock Commission Company in its general account; and a further specific denial of knowledge on its part that the same belonged to or at any time were claimed by the plaintiff or any one else than the depositor. the National Live Stock Commission Company. On these issues the cause was called for trial, which trial resulted in a judgment for plaintiff. To reverse this judgment defendant prosecutes its appeal to this court.

Defendant first assigns as error the act of the court in overruling its motion for a directed verdict. In fact, this constitutes the main assignment The evidence offered on behalf of the plaintiff discloses that he had been engaged in the live stock business for a number of years; that about the 1st of December, 1923, he made arrangements with the National Live Stock Commission Company to act as a clearing house through which to clear his drafts; that is. in purchasing stock he would pay for same by drafts on the said commission company, which drafts, in turn, were paid by said company through defendant bank and, upon sale of the stock, drafts arising therefrom would be deposited with the said company to reimburse it for the payment of the purchase price drafts. which said drafts were, in turn, deposited by said commission company to its credit in defendant bank. On February 2, 1925, plaintiff shipped three carloads of hogs to Fort Worth, Tex.. consigned to the Cassidy Southwestern Commission Company, and drew his draft upon said company for the sum of $4,000, which said draft was made payable to the National Live Stock Commission Company and was delivered to said company. Said draft was so delivered to said company to pay drafts then outstanding drawn by plaintiff on said commission company for the purchase price of said hogs.

This $4.000 draft was deposited by the said commission company to its credit in defendant bank, which bank, on February 3, 1925. charged the same against said commission company to take up an overdraft of said company at said bank. which amounted at said time to approximately $10.000, and refused payment on drafts drawn by plaintiff on said commission company to pay for the said hogs, said refused drafts amounting in the aggregate to the sum of $2.887 80, which drafts plaintiff afterwards paid.

The evidence further discloses that the said commission company carried its account with defendant bank from its organization in 1910 until it quit business on February 4, 1925; that said bank knew the character of the business of said commission company and knew that it was buying and selling live stock on commission.

The evidence further discloses that sometime in the year 1923. the United States government, through the Department of Agriculture, under authority of the acts of Congress to that effect, promulgated a rule

ordering that, when a consignment of cattle or hogs to a commission company is sold, the proceeds arising from the sale of such stock should be kept in a separate account; that in compliance with such regulation the National Live Stock Commission Company kept with defendant bank two accounts, one known as a "shippers' proceeds account," the other as a general account; that when a deposit was made by the said commission company to the credit of shippers' proceeds account, the deposit slip would have stamped thereon by said company with a rubber stamp "Cr. Shippers Proceeds Account," and when made to the general account, deposit slips would be stamped "Cr. General Account."

The said commission company, in compliance with the regulations of the Department of Agriculture, gave a bond to protect and secure shippers.

It is further established by the evidence that numerous drafts, probably 300 or 400 in number, were drawn by the plaintiff on the said commission company and paid by the defendant bank. Many of these drafts came through other banks, and had marked thereon "O.K'd by phone. C'ear through First National Bank." Many of them, possibly several hundred of them, bore defendant's collection stamp across their face. Plaintiff offered in evidence the $4,000 draft drawn by him on the Cassidy Southwestern Commission Company of Ft. Worth Tex., for the three carloads of hogs shipped them by him, which draft is as follows:

"Four 4 decks hogs shipped for 2-3-25 from Greenfield. Pay to the order of the National Live Stock Commission Company $4,000 exactly four thousand dollars 00 cents with exchange. Value received and charge to account of C. G. Duncan. To Cassidy Southwestern Commission Company, Stock Yards, Fort Worth, Tex Endorsed on face: First National Bank, Fort Worth, Tex. Received Feb. 4. 1925, Collection Dept."

This draft was cleared through the First National Bank of Ft. Worth. Tex., and the proceeds thereof, deposited in defendant bank to the credit of the said live stock commission company. The account of the said commission company was offered in evidence, and from December 4. 1924. until February 3, 1925. the date the defendant charged the proceeds of the draft against the live stock commission company to take up its overdraft. it showed a continuous daily overdraft ranging from $4,000 to $12,000.

This evidence is not in any material respect controverted by the defendant. The defendant bases its defense mainly upon the fact that it had no actual knowledge of the trust character of the fund, and that the passage of the Act of Congress commonly known as the Packers and Stockyards Act, hereinafter to be referred to, relieved it from any obligation on its part to make inquiry as to the character of the fund.

Did the court then err in overruling defendant's motion for a directed verdict? We think not. This evidence, to say the least, was sufficient upon which to submit to the jury the issue as to whether or not the bank had knowledge, or was chargeable with knowledge as to the trust character of the fund.

In the case of Southwest National Bank v. Evans, 94 Okla. 185, 221 Pac. 53, it is held by this court:

"It would be equally inequitable to give effect to the banker's lien in applying the funds of a stranger placed in the bank by the depositor, in satisfaction of the indebtedness of the latter, when the bank had probable notice of the special character, and therefore did not induce the advancement of the credit to which they were applied, or cause the bank to alter its relation with the debtor."

"If the previous business relations between a bank and depositor are such as to charge the bank with notice of probable agency or special ownership of the funds, the question becomes an issue of fact between the parties, and a general finding against the plaintiff is a finding in favor of the defendant on the question of agency or special ownership of the funds."

In the body of the opinion, at page 187, the court says:

"The nature of the brokerage company's business handled through the plaintiff bank was sufficient to charge the latter with notice that the brokerage company was at all times acting as agent either for the seller or purchaser, or at least sufficient to create an issue of fact for submission to the jury."

In the case of Union Stockyards Bank v. Gillespie, 137 U. S. 411, the court holds:

"A bank, receiving on deposit from a factor. under the circumstances set forth in this case. moneys which it must have known were the proceeds of property of the factor's principal, consigned to him by the principal for sale on the principal's account, of which moneys the principal was the beneficial owner, cannot, as against the latter, appropriate the deposits to the payment of a general balance due to the bank from the factor; and if it attempts to do so. the remedy of the principal against the bank is in equity and not at law."

And at page 415 of the opinion, the court says:

"Rappal, Sons & Co. were in the commission business—known to the bank to be in that business. They were not buyers and sellers, but factors—agents to sell. Presumably, therefore, moneys deposited by them were the proceeds of cattle consigned to them for sale. Their business being known to the bank, such presumption goes with their deposits; and while not of itself notice, it is a circumstance to compel inquiry on the part of the bank in respect to any particular deposit. We do not mean to be understood as implying that a bank receiving deposits, from one whom it knows to be in the commission business receives every deposit in trust for any unknown principal. A bank is not sponsor for all its depositors although it may know the character of their business. Its relations to its depositors are those of debtor; and, generally, receiving and paying out money on the checks of its depositors, it discharges the full measure of its obligations. It is not ordinarily bound to inquire whence the depositor received the moneys deposited, or what obligation such depositor is under to other parties. It is only when there gather around any deposit, or line of deposits, circumstances of a peculiar nature which individualize that deposit or line of deposits, and inform the bank of peculiar facts of equitable cognizance, that it is debarred from treating the deposit as that of moneys belonging absolutely to the depositor."

These cases are authority on the proposition that mere knowledge of the defendant bank that the National Live Stock Commission Company was engaged in the commission business was a circumstance sufficient to compel inquiry on the part of the bank in respect to this deposit.

The plaintiff, however, does not rely on this circumstance alone to charge defendant with knowledge as to the trust character of the fund. The numerous drafts drawn by plaintiff on the commission company and cashed by the defendant bank, and especially the manner in which these items were handled by the bank, were certainly notice to the bank of a trust relation existing between the plaintiff and the commission company, and upon the slightest inquiry it would have ascertained the real relation existing between them. Moreover, the very draft drawn by plaintiff on the Cassidy Southwestern Commission Company of Ft. Worth, the proceeds of which the defendant appropriated to take up the overdraft of said commission company, bore evidence, absolute on its face, that the proceeds thereof belonged to the plaintiff, and the slightest inquiry on the part of the bank would have disclosed that this draft was made payable to the commission company to take up the outstanding drafts drawn on said company,

given in payment for the hogs shipped, but instead of making such inquiry, the bank appropriated the proceeds in liquidation of the overdraft of said commission company, and refused payment on the drafts drawn by plaintiff on said company to the amount hereinabove set forth. The bank should not be permitted to profit by this transaction at the expense of the plaintiff.

In 13 A. L. R. 334, the author lays down the following principle:

"Where the bank, although having no actual notice of the character of the funds deposited with it, has knowledge of the circumstances such as are regarded as sufficient to necessitate inquiry upon its part, the general rule is that the bank cannot, as against the true owner, set off such funds against the individual indebtedness of the depositor to the bank."

See, also, the following cases: Union Stock Yards National Bank v. Moore, 79 Fed. 765; Bank of Guntersville v. Crayton (Ala.) 75 South. 7; Keeney v. Bank of Italy (Cal. App.) 165 Pac. 735; Clemmer v. Drovers National Bank (Ill.) 41 N. E. 728; Steere v. Stock Yards National Bank (Tex.) 256 S. W. 586. In the case last above cited, at page 592, the court says:

"This is an equitable proceeding, and we can perceive no reason in equity why the shippers of these cattle should be called upon, out of their own private funds, to liquidate some $40,000 of the overdraft which Graves created in the bank about six days before he failed. The undisputed facts in the certificate show that the bank was doubtful about permitting this overdraft of some $46,000. Its president called on Graves for an explanation before doing so. The conference shows beyond question that the bank, at that time, knew that most of the Graves deposits were in trust for others. But Graves told the bank president that he had sold cattle of his own for $65,000, and that the proceeds of such sale would be in within two or three days; that only about $8,000 of that amount belonged to others; that the remainder would easily care for the overdraft of some $46,000. Thereupon, the president permitted the overdraft. But, alas, the $65,000 was not forthcoming. Still, is that any reason why the shippers should make good the default of Graves in that promise by paying it themselves? They did not tell the bank to believe the promises Graves made it. The bank evidently did believe Graves when he promised the $65,000. If it was a victim of its own inability to judge of men in permitting them to create overdrafts, the shippers should not be called upon to pay for such misplaced confidence."

Under these authorities the judgment of the trial court is unquestionably correct.

The defendant seeks, however, to avoid the effect of these decisions by pleading the Act of Congress of August 15, 1921 (42 Stat. L. 161 to 169) vol. 3, 1923, Supplemental U. S. Comp. Stat. 1916, pages 2791 to 2804, commonly referred to as the Packers and Stockyards Act. Many subjects are covered by this act. The act, among other things, provides for the safeguarding of shippers of live stock shipped to a general market.

Section 407 of the act, referring to the Secretary of Agriculture of the United States, is as follows:

"The Secretary may make such rules, regulations and orders as may be necessary to carry out the provisions of this chapter, and may co-operate with any department or agency of the government, any state, territory, district or possession, or department, agency or political subdivision thereof, or any person."

And:

"Among these rules and regulations are the requirements with regard to the commission merchant or factor giving bond for the faithful accounting for trust funds coming into his hands, and providing for the deposit of such trust funds in the bank separate and apart from the other funds of the commission merchant."

The regulations further provide:

"Each market agency shall, before the close of the next business day following the sale of any live stock **consigned to it for sale,** transmit or deliver to the owner or consignor of the live stock a true, written account of such sale, showing the number, weight and price of each kind of animal sold, the name of the purchaser, the date of the sale, and such other facts as may be necessary to complete the account."

It is contended by defendant that it had a right to rely upon the National Live Stock Commission Company's compliance with this act, and the rules of the Secretary of Agriculture promulgated in pursuance thereof, and that this act relieved it from making inquiry as to the trust character of the funds in question; that it had a right to presume that all trust funds were deposited by the said commission company to the credit of shippers proceeds account, and was, therefore, not chargeable with constructive notice as to the character of the fund.

It is also contended by the defendant, that the evidence disclosing the National Live Stock Commission Company executed the bond provided for by the regulations above quoted to protect shippers plaintiff's remedy is by action on said bond and not against it. A complete answer to this contention is that the proceeds of the draft in question did not constitue proceeds arising from the sale of stock consigned to the said commission company for sale for the plaintiff. The proceeds of this draft constituted proceeds arising from the sale of hogs consigned to the Cassidy Southwestern Commission Company at Ft. Worth, and, as before stated, it was made payable to the National to take up outstanding drafts drawn on the said National, given by the plaintiff to the owners in payment of the purchase price of the hogs. The draft, in itself, was sufficient to charge the bank with notice thereof. This fund was not such fund as was required to be credited to the shippers' proceeds account, but was a fund to be used by the National to pay drafts drawn on it by plaintiff, and if deposit in the bank was properly deposited to the credit of the National in the general account.

The regulations of the Department of Agriculture provide that every marketing agency shall execute a bond conditioned to secure the owner or consignor the faithful and prompt accounting for their payment of the proceeds of the sale of live stock received for sale by such marketing agency for or on account of such owner or consignor. It is obvious, from the very language of this regulation, that plaintiff could not successfully maintain an action on the bond executed by the National to recover the proceeds of this draft.

We conclude, therefore, that this act is not available as a defense to the bank under the facts in this case.

Complaint is made to certain instructions given by the court and the refusal of the court to give certain instructions requested by defendant. Inasmuch as the only reason given by defendant in his brief, for predicating error in this regard, is the contention that the rule of constructive notice has been changed by the passage of the so-called Packers and Stockyards Act, having held that such act is not applicable to the facts in this case, this assignment need not be further discussed other than to say that the court did not commit error in this regard.

It is further contended that the court erred in receiving in evidence, over and against the objection of the defendant, numerous drafts drawn by the plaintiff on the National and paid by the defendant bank. There was no error in admitting these drafts in evidence.

It is contended that the bank should not be held liable, for the reason that it did nothing towards applying the deposit; that at the time the deposit was made the National

had an overdraft in excess of the amount of the draft, and the same was therefore automatically applied by reason of such overdraft. We see no merit in this contention, and the same will not be further discussed.

It is finally contended by defendant that the measure of its liability to the plaintiff, if liable at all. is only in the sum of $925.12, and this contention is based on the theory that the sum of $3,074.88 was paid out by the bank and charged to the account of the National subsequently to the deposit of the proceeds of the $4,000 draft. This contention is also without merit. The sum of $1,112.20 was paid out of the fund to take up drafts drawn by plaintiff on the National, and payment was refused on the remainder of these drafts, amounting in the aggregate to $2,-887.80. The items claimed to have been paid by the bank consisted of checks and drafts drawn by the National, or given to it payable at other banks and deposited by the National to its credit in defendant bank at the same time the $4,000 draft was deposited, and which items were returned unpaid and charged back to the account of the National by defendant bank.

In these circumstances it occurs to us it cannot seriously be contended that any portion of this trust fund had been dissipated, and that the defendant bank is entitled to credit by reason of these "charged-back" items.

This opinion might well end here were it not for the fact that our attention has been called to the case of Brady v. American National Bank of Oklahoma City, 120 Okla. 159, 250 Pac. 1006, wherein the following rule is announced:

"Where a trustee deposits money, belonging to his cestui que trust, in a bank, and no credit is extended on account of such deposit, and the bank in no way changes its position by reason thereof a lack of notice of the trust character of such deposit is immaterial, and the true owner may recover the amount thereof from such bank,"

If the holding in this case states the rule correctly. then the question as to the knowledge or lack of knowledge on the part of the bank as to the trust character of the fund in question becomes wholly immaterial; there was no question to submit to the jury and the plaintiff was entitled to a directed verdict in his favor.

The learned Commissioner writing the opinion in that case, while practically conceding that the holding is contrary to the weight of authority, seems to be of the opinion that such holding is supported by the

prior opinions of this court. We do not so read these opinions, but gather therefrom that the effect of the holdings therein announced is to the contrary. See Bank of Blackwell v. Dean, 9 Okla. 626, 60 Pac. 226; Fidelity & Deposit Co. of Md. v. Ranklin, 33 Okla. 7, 124 Pac. 71; Walters Nat. Bank v. Bantock, 41 Okla. 153, 137 Pac. 717; Gillette v. Liberty Nat. Bank, 95 Okla. 76, 218 Pac. 1057; Southwest Nat. Bank v. Evans, 94 Okla. 185, 221 Pac. 53.

In the case last above cited, the right of the bank to claim the fund was made dependent upon notice, either actual or constructive, on the part of the bank. In the case of Gillette v. Liberty Nat. Bank, supra the holding is as follows:

"The weight of authority is to the effect that the bank can apply a deposit to past due indebtedness of a customer, even though the deposit was in fact owned by another, if the bank had no notice of the true ownership of the fund; but this rule does not exist where the deposit was made in such manner as not to create the relation of debtor and creditor between the bank and the person in whose name the deposit was made."

In 13 A. L. R. 327, the following rule is announced:

"The decided weight of authority is to the effect that, where the bank in which funds in which third persons have an interest are deposited in the individual name of the depositor, has neither actual knowledge. nor notice of facts, sufficient to put it on inquiry, as to the true character of the deposit. it may apply the deposit to the individual debt of the depositor."

The author then cites, in support of this proposition, cases from California, Indiana, Idaho, Iowa, Kansas, Maryland, Massachusetts, Michigan, Missouri, Nevada, New York, North Dakota, and Pennsylvania.

In the case of Arnold v. San Ramon Valley Bank, 194 Pac. 1014, the Supreme Court of California says:

"In 7 C. J.. page 659. the rule is stated as follows: 'It is usually considered, however, that where a bank has no notice that funds deposited are held by the depositor in trust, it may apply such deposit to the depositor's debt without becoming liable to the beneficial owner.'

"There is a footnote to this statement which gives a long list of decisions in the several states, all of which support the text. In 111 Am. St. Rep. 419. appears a note to Garrison v. Union T. Co.. 139 Mich. 392, 102 N. W. 978, 70 L. R. A. 615, 5 Ann. Cas. 813, in which note the cases are also collected showing that the majority are largely in

support of the position of the defendant here. Another full citation of cases may be found in McStay, etc., Co. v. Stoddard, 35 Nev. 297, 132 Pac. 545. We need not repeat these citations here. The point is so well established by authority, both in this state and elsewhere, that we deem it unnecessary to discuss it on principle.

"The plaintiff relies on Burtnett v. First Nat. Bank, 38 Mich. 630; Shotwell v. Sioux F. S. Bank, 34 S. D. 109, 147 N. W. 228, L. R. A. 1915A, 715; Cady v. South Omaha Bank, 46 Neb. 756, 65 N. W. 906, and cases in Texas and South Carolina, all of which appear to hold the opposite doctrine to that above stated. In Michigan the later case of Garrison v. Union T. Co., supra, follows the prevailing rule and apparently overrules the Burtnett Case, although it does not mention it. So. also, in Nebraska a later decision indicates that the Cady Case has been repudiated there. Globe Sav. Bank v. Nat. Bank of Commerce, 64 Neb. 413, 89 N W. 1030. We are not disposed to follow these cases, in view of the thoroughly established rule to the contrary."

See, also, the case of McStay, etc., Co. v. Stoddard (Nev.) 132 Pac. 545, where the authorities are reviewed at length.

In view of the fact that some of the courts announcing the rule laid down in the above opinion have apparently departed therefrom in later cases, this court should not follow the reasoning of such line of cases.

In our opinion the holding in this case is out of line with the weight of authority, and we do "not choose" to rest this opinion on the rule therein announced.

We are of the opinion that the judgment of the trial court is correct, and should be sustained on the theory that the bank, under the evidence in this case, was chargeable with notice as to the trust character of the fund.

Judgment of the trial court should be affirmed.

BENNETT, DIFFENDAFFER, HALL, and JEFFREY, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) 7 C. J. p. 659, §357; anno. 10 L. R. A. (N. S.) 706; 13 A. L. R. 324; 31 A. L. R. 756; 3 R. C. L. p. 593; 1 R. C. L. Supp. p. 860; 4 R. C. L. Supp. p. 204; 5 R. C. L. Supp. p. 188; (2) 7 C. J. p. 659, §357. (3) 7 C. J. p. 669. §376. (4) 7 C. J. p. 669, §376; p. 670, §377.