BLACKWELL LIVESTOCK AUCTION,
INC., Appellee,

v.

COMMUNITY BANK OF SHIDLER,
OKLAHOMA, a state banking
corporation, Appellant,

v.

Clarence Jerry MULLINS, a/k/a
Jerry Mullins, Defendant.

No. 78623.

Court of Appeals of Oklahoma,
Division No. 2.

Oct. 5, 1993.

David M. Collins, Gungoll, Jackson, Collins & Box, P.C., Enid, for appellee.

James M. Bailey, Ponca City, for appellant.

Mary Beth Guard, Gen. Counsel, Oklahoma Bankers Ass'n, Oklahoma City, amicus curiae.

RAPP, Judge.

Trial court defendant, Community Bank of Shidler, appeals a motion for summary judgment in favor of plaintiff, Blackwell Livestock Auction, Inc., BLA, resulting from Bank's refusal to honor a check deposited by Blackwell.

The facts herein are not disputed by the parties. The trial court defendant, Clarence Mullins,[1] was a commission agent engaged in purchasing livestock on another's behalf. Under the Federal Packers and Stockyards Act, 1921, he was a "Market Agency" and was required to post a reasonable bond.[2]

Blackwell, or BLA, is an auction facility for sellers and buyers of livestock for which it receives a commission. On May 11, 1990, Mullins, acting on behalf of Lewis Feedlot of Nebraska, purchased 140 head of cattle from BLA. He paid BLA for 130 head by his check no. 6018, drawn on the Bank in the amount of $89,830.89. He promised BLA he would deliver a check the next day in the sum of $6,850.75 for the remaining ten head of cattle. The entire lot of 140 head of cattle was shipped to Lewis Feedlot. On May 14, 1990, Lewis Feedlot wire transferred $98,881.19 to Mullins' account at the Bank, apparently as and for payment of the 140 head of cattle.

Mullins maintained a single "general checking" account at the Bank which he used for his business of buying and selling cattle. The account may have also been used for other personal purposes. The Bank was aware of and had permitted Mullins' practice of writing checks on this single account to pay for cattle purchases prior to receipt of deposits to cover the checks.[3]

Mullins' checking account on May 15, 1990, at the Bank's opening of business showed a ledger balance of $314,570.23. That same morning, however, Chisholm Trails State Bank of Wichita, apparently operating under Regulation CC; 12 C.F.R. § 229.33 (1993),[4] notified the Bank that a deposit previously credited to Mullins' account for checks drawn on the Cedar Vale Sale Barn's account at the Chisholm Trails Bank, was being returned due to insufficient funds in the Cedar account. The total amount of the checks being returned was $465,548.96. The amount of the returned Cedar deposit would exceed Mullins' then-existing account balance of $314,570.23 and would yield a negative balance in Mullins' account in the amount of $150,978.73. The Bank placed a hold on Mullins' account to prevent payment of additional checks. It then issued a cashier's check to itself drawn against the account in the sum of $314,570.23 and closed Mullins' account. Later that same day, BLA presented Mullins' check no. 6018, given in payment of 130 head of cattle, in the amount of $89,830.89 to the Bank. The Bank returned the check to BLA for "insufficient funds."

---

1. Mullins did not appeal or participate in the appeal.

2. 7 U.S.C. §§ 201(c), 204 (1980). The Act requires the maintenance of a bond to secure seller's payment. Mullins maintained this bond with the Bank in the form of a certificate of deposit in the sum of $80,000. The Bank knew the purpose of this bond.

3. In addition to this "general checking account," he also maintained a separate trust fund deposit at the Bank to meet his bond requirements under the Packers and Stockyards Act, 1921. See supra note 2.

4. The Expedited Funds Availability Act, 12 U.S.C. §§ 4001–4010 (1989), and its implementing Regulation CC; 12 C.F.R. §§ 229.1–.42 (1993), allows telephonic communication for reasonable notice of non-payment.

BLA filed this action against both the Bank and Mullins. It sought recovery from the Bank of $96,681.64, the value of the 140 head of cattle sold to Mullins.

The Bank, apparently as part of its defense and to mitigate damages, then brought an interpleader action with respect to the separate bond it held on Mullins' behalf under the Packers and Stockyards Act, 1921.[5] BLA recovered $69,520.63 as its pro rata share of the interpleaded bond. BLA then moved for summary judgment against the Bank in its original action on its claims of conversion and constructive trust and for foreclosure of an equitable lien. The Bank also moved for summary judgment.

The trial court granted judgment for BLA. It cited *First National Bank v. Duncan*, 127 Okla. 226, 260 P. 491 (1927) (overruled on other grounds), for authority that the Bank's "mere knowledge" its customer was engaged in the commission cattle business would be "a circumstance sufficient to compel Bank's inquiry into the nature of the wire transfer from Lewis Feedlot." The trial court found that:

> Bank had sufficient knowledge of the nature of Mullins' business to put it under a duty of inquiry about the wire transfer.... Had Bank made some inquiry it could have easily learned that the wired funds were in payment for livestock and belonged to BLA.

The court then ruled "[t]he *entire sum, $98,881.00* [*sic*], wired by Lewis Feedlot to Bank belonged to [BLA]." (Emphasis added.) The court then deducted the amount of BLA's pro rata recovery against the bond, $69,520.63, from the amount it found was wired by Lewis Feedlot, $98,881.00, which resulted in a balance due of $29,-360.37. The court then granted judgment against the Bank in the principal amount of $29,360.37, plus interest, court costs and attorney fees.

■ The Bank appeals asserting trial court error in its reliance on the *Duncan* decision. *Duncan* involved a draft by an out-of-state livestock commission firm, not a customer of the bank, sent to a bank's customer, also a livestock commission firm, who was indebted to the bank. The bank's customer deposited the draft to its account and the bank offset the draft against the debt. The draft specifically stated it was for the sale of livestock and was to be charged to the account of another third party, Duncan, who was not a bank customer.

The *Duncan* court held, in essence, under circumstances closely similar to those here present, that where a bank knew that the business of its customer account holder was the buying and selling of livestock on commission, and that where a deposit to its customer's account was clearly from a third party engaged in the livestock business, the bank was then placed on notice of its duty to inquire into the possible trust nature of the deposit and the deposit's true ownership before it could apply such deposit to an overdraft or debt of the account holder.

In *Duncan*, the court cited *Union Stockyards Nat. Bank v. Gillespie*, 137 U.S. 411, 11 S.Ct. 118, 34 L.Ed. 724 (1890), clarifying that the recovery of monies set off by a bank from a factor's account, where the monies are the property of the factor's principal, is an action at equity and not law. Moreover, the Oklahoma Supreme Court, after quoting *Gillespie*,[6] then stated:

> These cases are authority on the proposition that mere knowledge of the de-

---

5. *See supra* note 2.

6. The Oklahoma Supreme Court quoted the following from *Gillespie*:

> A bank, receiving on deposit from a factor, under the circumstances set forth in this case, *moneys which it must have known were the proceeds of property of the factor's principal,* consigned to him by the principal for sale on the principal's account, of which moneys the *principal was the beneficial owner, cannot, as against the latter, appropriate the deposits to*

> *the payment of a general balance due to the bank from the factor; and if it attempts to do so, the remedy of the principal against the bank is in equity and not at law.*
>
> ....
>
> Rappal, Sons & Co. were in the commission business,—known to the bank to be in that business. They were not buyers and sellers, but factors,—agents to sell. Presumably, therefore, moneys deposited by them were the proceeds of cattle consigned to them for sale. Their business being known to the bank, such

fendant bank that the National Live Stock Commission Company was engaged in the commission business was a circumstance sufficient to compel inquiry on the part of the bank in respect to this deposit.

*Duncan,* 127 Okla. at 230, 260 P. at 494. While *Duncan* is not here precisely on all fours, it serves as an excellent guide. Moreover, it is clearly apparent under the undisputed facts before us that the Bank's admitted knowledge of Mullins' principal use of his account for "order buying" was sufficient to place it under a duty to inquire as to the nature of the wire transfer deposit from the out-of-state depositor, Lewis Feedlot. The Bank, in breaching this duty, then erroneously denied payment of BLA's check given it by Mullins. Thus, the trial court was correct in its ruling that the Bank did have a duty to inquire.[7]

■ The Bank also advances a general economic handicap argument as one part of its appeal. It asserts that the trial court's decision would impose an unreasonable and unrealistic duty of inquiry upon banks, thereby impeding the efficient and effective processing of banking transactions. Under normal circumstances, a bank clearly has a right to appropriate funds in an account against a debit balance. However, imposing a duty of inquiry is not unreasonable where, as here, a bank accepts the business and knows its customer uses the account for the buying and selling of livestock on commission, and that the funds wired to or deposited with the bank to the account are from a third party source involved in the buying and selling of livestock. Where a bank does not have such knowledge, or this knowledge cannot reasonably be imputed to it, there is no duty to inquire. Thus, the trial court's decision under the facts of this case did not impose an unreasonable duty on the Bank.

■ The Bank also, in a less than single page argument, asserted trial court error in its calculation of damages. With this we agree. Although the trial court correctly found that BLA was entitled to an interest in the Lewis wire transfer funds, it erred in holding BLA was entitled to the entire amount of the transfer, less the amount recovered from Mullins' bond. The Lewis remittance to Mullins' account in the amount of $98,881.19 was for *140* head of cattle.[8] However, BLA's check presented to the Bank was for $89,830.89, the amount Mullins gave BLA for *130* head of cattle.

presumption goes with their deposits; and, while not of itself notice, it is a circumstance to compel inquiry on the part of the bank in respect to any particular deposit. We do not mean to be understood as implying that a bank receiving deposits from one whom it knows to be in the commission business receives every deposit in trust for any unknown principal. A bank is not sponsor for all its depositors, although it may know the character of their business. Its relations to its depositors are those of debtor; and, generally, receiving and paying out money on the checks of its depositors, it discharges the full measure of its obligations. It is not ordinarily bound to inquire whence the depositor received the moneys deposited, or what obligation such depositor is under to other parties. *It is only when there gather around any deposit, or line of deposits, circumstances of a peculiar nature, which individualize that deposit or line of deposits, and inform the bank of peculiar facts of equitable cognizance, that it is debarred from treating the deposit as that of moneys belonging absolutely to the depositor.* (Emphasis added.) *Duncan,* 127 Okla. at 229–30, 260 P. at 494 (quoting *Union Stock–Yards Nat. Bank v. Gilles-*

*pie,* 137 U.S. 411, 11 S.Ct. 118, 34 L.Ed. 724 (1890)).

7. The Bank knew: (1) the Lewis Feedlot was without the state; (2) it had a longstanding practice with Mullins of honoring his checks given to livestock sellers prior to his sale of the livestock; (3) Mullins had a bond placed with the Bank for purposes of meeting the requirement of the Shippers and Packers Act consistent with his status as a "Market Agency"; and (4) the Bank's Chairman of the Board stated in deposition he understood Mullins utilized his bank account "[p]rimarily as order buying," whereby cattle were purchased at one end and sold on the other for a commission; and that order buyers normally operate by writing a check on the account prior to receiving the resale proceeds. He further agreed that Mullins would buy cattle and sell the cattle and take funds from the person to whom he sold the cattle and cover the checks he had written for the purchase of the cattle.

8. BLA sued for the amount due on 140 head of cattle, $96,681.64. The difference between this sale price and the wire transfer, $98,881.19, was possibly Mullins' commission.

Although Mullins promised to deliver a check for the other ten head of cattle the next day, there is no evidence he did so. Moreover, there is no evidence that a check for the other ten head of cattle was presented by BLA to the Bank. The Bank cannot be held liable for wrongful dishonor of a check never presented, nor can an equitable lien under the facts before us be impressed on funds in excess of the BLA-presented check, $89,830.89. Further, BLA is limited in its recovery from the Bank for the amount of the Mullins check presented to and dishonored by the bank, less BLA's recovered pro rata share of Mullins' bond, $69,520.63. Thus, BLA should be granted judgment against the Bank with interest from the date of judgment in the sum of $20,310.26.

▮ Finally, the Bank asserts trial court error in holding BLA entitled to attorney fees. It grounds this assertion on the trial court's failure to state the legal theory on which its ruling was based. This argument is without merit. Although the trial court did not state the legal theory on which its decision was based, the decision in *Gillespie*, 137 U.S. at 411, 11 S.Ct. at 118, plainly shows this is a matter in equity and this was a suit to enforce an equitable lien. The trial court here reached a clear, well-reasoned and correct decision. Its award of attorney fees was proper. *See Security St. Bank v. Johnston & Co.*, 204 Okla. 160, 228 P.2d 169 (1951).

The trial court decision granting BLA a money judgment in the principal amount of $29,360.37 is hereby modified to reflect the correct sum of $20,310.26 and the matter is remanded with instructions for the trial court to recalculate the interest due based on the lower amount and enter judgment accordingly.

The trial court decision is affirmed as modified and remanded for the reasons set out above.

BOUDREAU, P.J., and REIF, V.C.J., concur.